Filed 11/19/13  City of Los Angeles v. Superior Court CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>    Respondent;<br><br>WATER AND POWER EMPLOYEES' RETIREMENT PLAN et al.,<br><br>    Real Parties in Interest. | B246933<br><br>(Super. Ct. No. BC449834) |

ORIGINAL PROCEEDINGS in mandate.  Charles F. Palmer, Judge.  Petition denied.

Carmen A. Trutanich and Michael N. Feuer, City Attorneys, Gregory P. Orland, Adena M. Hopenstand and Dora A. Gonzalez, Deputy City Attorneys, for Petitioner.

No appearance for respondent.

Schwartz, Steinsapir, Dohrmann & Sommers, Henry M. Willis, D. William Heine, and Steven M. Zimmerman for Real Parties in Interest.

_____

## INTRODUCTION

This case arises out of an attempted amendment to the Water and Power Employees' Retirement Plan (WPERP). WPERP's Board of Administration (Board) enacted the amendment and the Board of Water and Power Commissioners (Commissioners) approved it, but the Los Angeles City Council (City Council) vetoed it. The City of Los Angeles (City) demurred to the complaint by real parties in interest—WPERP, the Board, and four current and former members of the Board—in part on the ground that WPERP and the Board are sub-units of the City and lack the capacity to sue the municipal corporation of which they are a part and do not have standing to maintain this action. The trial court overruled the demurrer.

The City filed this petition for a writ of mandate directing the trial court to vacate its order overruling the City's demurrer to the first amended complaint by WPERP and the Board[1] and to enter a new order sustaining the demurrer without leave to amend. We deny the petition.

---

[1] The City states in its brief that it refers to WPERP and the Board "collectively . . . in the singular as WPERP unless otherwise specified." We will do the same.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

A.    *The Factual Allegations*

WPERP is an employee benefit plan providing pension and retirement benefits for employees of the Los Angeles Department of Water and Power (DWP).  The DWP is a "proprietary" department of the City.  (L.A. City Charter, § 600(a) (City Charter).)  It operates autonomously, having an independent source of funding and a separate budget.  (*Id.*, § 603.)  Five Commissioners, appointed by the mayor of the City, oversee the operation of the DWP.  (*Id.*, §§ 600(b), 604(a).)  The DWP has a general obligation to pay WPERP benefits under the City Charter, section 1188(c).

WPERP is managed by the Board, which is an independent retirement board of the City.  (City Charter, § 1104(c).)[3]  The Board has "plenary power over the administration and management of [WPERP] to, among other things, 'assure the competency of the assets' of [WPERP] in accordance with recognized actuarial methods."  (See Cal. Const., art. XVI, § 17; City Charter, § 1106.)  The City Charter exempts from City Council review "actions of the Board" of WPERP.  (City Charter, § 245(d)(4); see *id.* § 1114 ["[t]he right of Council to veto board decisions provided in Section 245 shall not apply to decisions of the City's pension and retirement boards"].)

---

[2]    "Because this matter comes to us on demurrer, we take the facts from [the] complaint, the allegations of which are deemed true for the limited purpose of determining whether [WPERP] has stated a viable cause of action" against the City.  (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885; *Bank of America Corp. v. Superior Court* (2011) 198 Cal.App.4th 862, 870.)  We also deem true facts contained in the exhibits attached to the first amended complaint (*Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 767-768) and those subject to judicial notice (*Coker v. JP Morgan Chase Bank, N.A.* (2013) 218 Cal.App.4th 1, 6, fn. 2, petn. for review pending, petn. filed Sept. 4, 2013, time for grant or denial of review extended to Dec. 3, 2013; *Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Property Casualty Co. of America* (2011) 197 Cal.App.4th 424, 431).

[3]    In contrast to the Commissioners, the members of the Board are not appointed by the mayor.  Its members come from the DWP and WPERP.  (City Charter, § 1104(c).)

3

The Los Angeles City Employees' Retirement System (LACERS) is a department of the City providing retirement benefits to City employees other than DWP employees.[4] As of May 25, 2010, WPERP and LACERS had a reciprocity agreement, referred to by WPERP as the Reciprocal Arrangement Between the Plan and the City Employees' Retirement System (Reciprocal Arrangement), providing for reciprocity and portability between the two plans. Under the Reciprocal Arrangement an employee who enters DWP service from another City department or office and who has made retirement contributions to LACERS can elect to receive credit from WPERP for his or her prior City service. The employee's contributions to LACERS—but not the City's contributions on behalf of the employee—are then transmitted to WPERP, and the DWP contributes 110 percent of that amount to WPERP. LACERS has similar, but not identical, reciprocity provisions for employee transfers from DWP to City service. (L.A. Admin. Code, § 4.1060.)

When the Reciprocal Arrangement was adopted in 1980, WPERP and LACERS estimated that transfers of employees and funds between the DWP and the City and the resulting liability of WPERP and LACERS would be roughly equivalent and equitable. WPERP and LACERS, however, each retained the right to discontinue the Reciprocal Arrangement should the assumption the transfers would be roughly equivalent prove incorrect. For most of the 30 years the Reciprocal Arrangement was in place, the transfers were, in fact, roughly equivalent.

Recently, however, with the City's encouragement, a "substantially greater" number of City employees have transferred to the DWP. "This influx of City employees, to whom [WPERP] was required to provide benefits based on service credits they earned while in positions covered by LACERS, but without the benefit of any of the City's

___

[4] Section 1102 of the City Charter created WPERP (subd. (b)), LACERS, and the Fire and Police Pension System (subd. (a)). It also created boards of commissioners or administration for the three pension plans. (*Id*., subd. (c).)

employer contributions paid to LACERS on behalf of those employees, has created in excess of $183 million in unfunded liabilities for the WPERP."

In response the Board took action to stop WPERP's losses. On May 26, 2010 the Board voted to amend WPERP to suspend the Reciprocal Arrangement while the Board studied the problem. The Board voted to amend section IV, subsection J, division (2) to add subdivision (e), which reads: "Notwithstanding the above, effective upon the adoption of this subdivision, eligibility for reciprocity under this subsection shall be suspended for all employees who transfer to the Department of Water and Power from other positions with the City of Los Angeles or who are hired by the Department of Water and Power after having been terminated from other positions with the City of Los Angeles." The Board also voted to amend Section IV, subsection L, by adding division (6), which reads: "Effective upon adoption of this division, new members of [WPERP] shall not be eligible to purchase service with the City of Los Angeles under this subsection." On September 7, 2010 the Commissioners, pursuant to section 1186 of the City Charter,[5] approved the amendments.

On September 22, 2010, however, the City Council voted to assert jurisdiction over the Commissioners' action pursuant to section 245 of the City Charter. On October 13, 2010 the City Council vetoed the Commissioners' approval of the Board's action. As a result, millions of dollars in pension liability has been transferred from LACERS to WPERP, the DWP's contribution rate to WPERP has increased, and the City's contribution rate to LACERS has decreased. The City Council's action "effectively accomplishes what the City cannot do under the City Charter and the

---

[5] Section 1186 of the City Charter provides: "The provisions of [WPERP] may be amended from time to time to provide retirement, disability or death benefits upon the approval of [Commissioners] and adoption by the [Board]. Prior to the adoption of any benefit change, a report from [WPERP]'s actuary must be presented to both the [Board] and the [Commissioners] analyzing the cost impact of the proposed changes upon [WPERP]."

5

California Constitution: transfer funding from WPERP to LACERS and thereby aid the City's efforts to balance its budget."

B.    *The Litigation*

On November 17, 2010 current and former members of the Board—Javier Romero, Cindy Coffin, Barry Poole, and Michael Moore—filed this action. They sued the City and the City Council seeking a writ of mandate, preliminary and permanent injunctions, and declaratory relief to force the City Council "to rescind its purported veto" of the Commissioners' approval of the Board's amendments to WPERP.

Meanwhile, on November 10, 2010 the Board had adopted resolutions to join in this litigation and to retain as its counsel the attorneys representing the individual Board members. Pursuant to section 275 of the City Charter, the Board requested that the Los Angeles City Attorney consent to the representation.[6] On December 14, 2010 the City Attorney denied consent, explaining that "[b]y Charter the City's Attorney's 'consent' to the retention of outside counsel is limited to circumstances where outside counsel would 'assist' the City Attorney. Since the underlying dispute concerns a legislative matter within the purview of the [WPERP] sponsor and not of the Board, the Board cannot join in the subject litigation, and there is no need for such assistance. . . . Additionally, we note that without such consent, the Board cannot retain outside legal counsel to represent it or its members in the subject litigation, and, accordingly, the Board is not authorized to expend [WPERP] funds to pay for any services of outside counsel."

---

[6]    Section 272 of the City Charter provides generally for control of litigation involving the City by the City Attorney. It also provides in subdivision (c) that "[t]he boards of the Proprietary Departments," including WPERP, "shall make client decisions in litigation exclusively involving the policies and funds over which the Charter gives those boards control." Section 275 provides: "Upon recommendation of a board enumerated in Section 272(c), and the written consent of the City Attorney, the City may contract with attorneys outside of the City Attorney's Office to assist the City Attorney in providing legal services to that department. . . ."

6

On January 4, 2011 the City answered the complaint on behalf of itself and the City Council, which real parties in interest had erroneously sued as a separate entity. One of the City's affirmative defenses was that the Board and its members could not sue the City in their official capacity because "they are part of the municipal corporation that is the City and they have no authority under the Charter to bring suit." The City also alleged as an affirmative defense that counsel of record for the Board members could not represent them because only the Los Angeles City Attorney can represent Board members in their official capacity under section 272 of the City Charter.[7]

On September 12, 2012, after the trial court had granted their motion for leave to amend, real parties in interest filed the operative first amended complaint. The first amended complaint added WPERP and the Board as involuntary plaintiffs and nominal defendants on the ground they were necessary parties under Code of Civil Procedure section 389, subdivision (a).

On October 11, 2012 the City filed a demurrer. In addition to challenging the various causes of action, the City claimed that "[t]he First Amended Complaint in its entirety fails to state a claim upon which relief can be granted as to the 'Putative Defendants' because they lack standing and thus there is defective joinder as a matter of law when their 'plenary power' under Article XVI, section 17 of the California Constitution does not extend to plan amendments," and "because 'Putative Defendants' are sub-units of the City without the capacity to sue the municipal corporation of which they are a part."

In overruling the City's demurrer, the trial court found that WPERP and the Board "were not misjoined and that they are appropriate parties to assert the City's actions have invaded the plenary powers of the [Board]. The court has reviewed again *Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095 and, in particular its lengthy

---

[7] The City did not file a motion to disqualify counsel of record for the Board and its members. The City maintains that it "is per se prejudiced in its defense of the action which cannot be cured by mere disqualification of real parties' counsel."

discussion of the legislative history of the amendment by initiative of article XVI, section 17 of the California Constitution and finds that while the discussion is instructive, it is not definitive of the issues in the present case."

The trial court concluded that "[i]n particular, it appears that [a]rticle XVI, section 17 gives the [Board] 'the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system[.] In this context, the "plenary authority" that is granted over the "administration of the system" goes to the management of the assets and their delivery to members and beneficiaries of the system[.] Thus, with regard to administration of the system, the Board's authority is limited to actuarial services and to the protection and delivery of the assets, benefits, and services for which the Board has a fiduciary responsibility[. T]he thrust of the ballot arguments in favor of [a]rticle XVI, section 17 is to prevent the Legislature from "raiding" pension funds[.] The full argument in favor of the initiative warns that politicians would continue to raid the pension funds of retirees unless [a]rticle XVI was passed. It complains it was "not right" to allow politicians to "balance their budgets on the backs of senior [citizens] and retirees."' [(*Westly v. Board of Administration*, *supra*,] 105 Cal.App.4th at [pp.] 1110-1112.) Thus, it appears to the court that the [Board] has a fiduciary duty to protect the assets of the fund in particular from politicians raiding the pension fund or balancing their budgets on the backs of the fund beneficiaries. Insofar as the [first amended complaint] effectively alleges a scheme by the City Council to balance their budget by wrongfully utilizing the reciprocity provision to relieve the City's budget problems by reducing its obligations to another fund, the court finds that the [Board] and [WPERP] have standing to challenge the encroachment on the Board's plenary powers as described in *Westly*. . . ."

8

**DISCUSSION**

A. *Propriety of Writ Review and Standard of Review*

"'An order overruling a demurrer is not directly appealable, but may be reviewed on appeal from the final judgment. [Citation.] Appeal is presumed to be an adequate remedy and writ review is rarely granted unless a significant issue of law is raised, or resolution of the issue would result in a final disposition as to the petitioner. [Citation.]' [Citation.]" (*Boy Scouts of America National Foundation v. Superior Court* (2012) 206 Cal.App.4th 428, 438; see, e.g., *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 134; *Teva Pharmaceuticals USA, Inc. v. Superior Court* (2013) 217 Cal.App.4th 96, 100.) We agree with the City that its petition raises a significant issue of law and that writ review is appropriate.

Our review of the trial court's order overruling the City's demurrer is de novo. (See *Teva Pharmaceuticals USA, Inc. v. Superior Court*, *supra*, 217 Cal.App.4th at p. 102; *Boy Scouts of America Nat. Foundation v. Superior Court*, *supra*, 206 Cal.App.4th at p. 438.) We determine whether the facts alleged in the complaint and those of which we can take judicial notice are ""sufficient to state a cause of action under any legal theory."" (*May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1324; *Law Offices of Mathew Higbee v. Expungement Assistance Services* (2013) 214 Cal.App.4th 544, 551.)

B. *Judicial Notice*

The City has requested that we take judicial notice of (1) a meeting notice for the Board that the City claims identified the City Attorney as the Board's "legal counsel"; (2) documents, filed in this case after the trial court overruled the City's demurrer, demonstrating that WPERP and the Board have appeared as plaintiffs in this action; (3) various current and former City Charter provisions; (4) two formal opinions of the Los Angeles City Attorney interpreting the City Charter; (5) a minute order in a previous case (*Gates v. Board of Police Commissioners* (Super. Ct. L.A. County, 1991,

9

No. BS006789)) discussing the structure of city government; and (6) a formal ethics opinion by the California State Bar addressing the ethical duties of a city attorney. Real parties in interest request that we take judicial notice of additional City Charter provisions.

We grant the parties' requests to take judicial notice of the relevant provisions of the City Charter. Under Evidence Code section 452, subdivision (b), we may take judicial notice of "[r]egulations and legislative enactments issued by or under the authority of . . . any public entity in the United States." (See, e.g., *Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191, 1194, fn. 1; *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 917, fn. 1.) This includes the legislative history of the charter provisions. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 225, fn. 6.)

We deny the City's request to take judicial notice of the Board's meeting notice. While the fact of the notice might be subject to judicial notice under Evidence Code section 452, subdivision (c) ["[o]fficial acts"], or subdivision (h) ["[f]acts and propositions that are not reasonably subject to dispute"], the reference to "legal counsel" in the notice is not an official act of a public entity or an undisputed fact in the context of this litigation. (See *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 309, fn. 20.) *Machado v. State Water Resources Control Bd.* (2001) 90 Cal.App.4th 720, on which the City relies, states only that the court took judicial notice of meeting agendas. (*Id.* at p. 723, fn. 2.) *Machado* does not hold that the court may take judicial notice of the truth of factual statements in those agendas. (See *Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 770 [court took judicial notice of existence of resolution but "not of the truth of its contents"]; *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [judicial notice of the existence of documents in a court file does not equate to judicial notice of hearsay statements within those documents].)

We also deny the City's request to take judicial notice of documents filed in this case after the trial court overruled the City's demurrer because they are not relevant. These documents reflect that WPERP and the Board joined the litigation as active

10

plaintiffs. The City argues that these documents establish that WPERP and the Board appeared in this action as plaintiffs, and that "[t]his is relevant to the issue of the petition's unitary form of government issue." The first amended complaint, however, already establishes that WPERP and the Board are plaintiffs. The resolution in this appeal of the legal issue of whether the City's unitary form of government precludes WPERP and the Board from suing the City does not depend on whether WPERP and the Board are participating in this action as voluntary or involuntary plaintiffs. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [judicial notice denied where "the requests present no issue for which judicial notice of these items is necessary, helpful, or relevant"]; *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 342, fn. 6 [judicial notice denied where materials are not "relevant or necessary" to the court's analysis]; *San Diego City Firefighters, Local 145 v. Board of Administration etc.* (2012) 206 Cal.App.4th 594, 600, fn 3 [judicial notice denied because "the document at issue is not necessary to our resolution of this appeal"] .)

We grant the City's request to take judicial notice of formal opinions by the city attorney under Evidence Code section 452, subdivision (c). (See, e.g., *Evans v. City of Berkley* (2006) 38 Cal.4th 1, 9, fn. 5; cf. *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 854, fn. 9 [opinion letter from Attorney General's office]; *Neville v. County of Sonoma* (2012) 206 Cal.App.4th 61, 69 [same].) "Administrative interpretations [of City Charter provisions] of longstanding are entitled to great weight unless they are plainly wrong. [Citations.]" (*Baird v. City of Los Angeles* (1975) 54 Cal.App.3d 120, 123.)

We deny the City's request to take judicial notice of the minute order in the *Gates* case. The City acknowledges it has no precedential value. (See *B.F. v. Superior Court* (2012) 207 Cal.App.4th 621, 627, fn. 2 [denying request for judicial notice of probate court minute orders because "'[t]rial court decisions are not precedent'"]; *Bolanos v. Superior Court* (2008) 169 Cal.App.4th 744, 761 ["[e]ven assuming . . . that the case in question involves the same issue as the case before us . . . , a written trial court ruling has

11

no precedential value"].)  And, as noted above, we cannot take judicial notice of the truth of the statements in the order.

Finally, we deny the City's request to take judicial notice of the State Bar's formal ethics opinion.  The cases on which the City relies do not support the City's broad claim that we may "take judicial notice of matters posted on the State Bar's website."  Rather, they address specific documents not at issue here.  (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [judicial notice of State Bar report]; *People v. Vigil* (2008) 169 Cal.App.4th 8, 12, fn. 2 [judicial notice of attorney's disciplinary record].)  "Because the State Bar is an administrative arm of the court only in its admissions and disciplinary functions [citation], the record of [other actions taken by the State Bar are] not subject to judicial notice as a record of the acts of the judicial department under subdivision (c) of Evidence Code section 452.  Although the State Bar has been described as a public corporation and akin to a state public body or agency [citation], subdivision (c) does not clearly make its actions matters subject to judicial notice as acts of either the legislative or executive department."  (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325.)  The City cites no other authority to suggest the opinion is subject to judicial notice.  In any event, the opinion interprets rules 3-310 and 3-600 of the California Rules of Professional Conduct, and the City fails to explain how the opinion is relevant to this petition.[8] (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison*, *supra*, 18 Cal.4th at p. 748, fn. 6; *Appel v. Superior Court*, *supra*, 214 Cal.App.4th at p. 342, fn. 6.)

C.      *WPERP Has the Capacity To Sue and Was Properly Joined as a Party.*

The City contends that the trial court erred in ruling that WPERP has "standing to challenge the encroachment on the Board's plenary powers."  The City's contentions fall

---

[8]      The City's assertion that "[t]his opinion is relevant to the unitary government issue because the City is structured as a unitary governmental entity and as such the City speaks with one voice," is circular and not an explanation of the relevancy of the State Bar opinion.

12

into two general categories: that WPERP lacks the *capacity* to participate in this litigation and that WPERP lacks *standing* to challenge the City Council's veto of WPERP's suspension of the Reciprocal Agreement.

A party to litigation "must have both capacity to sue (the right to come into court) and standing to sue (the right to state a cause of action seeking particular relief). [Citation.]" (*Smith v. Cimmet* (2011) 199 Cal.App.4th 1381, 1390; accord, *Washington Mutual Bank v. Blechman* (2007) 157 Cal.App.4th 662, 669.) "Incapacity is . . . a legal disability, such as minority or incompetency, which deprives a party of the right to represent his or her own interests in court. On the other hand, standing to sue—the real party in interest requirement—goes to the existence of a cause of action, i.e., whether the plaintiff has a right to relief. [Citations.]" (*American Alternative Energy Partners II v. Windridge, Inc.* (1996) 42 Cal.App.4th 551, 559; accord, *Smith*, *supra*, at p. 1390; *Washington Mutual Bank*, *supra*, at p. 669; *Color-Vue, Inc. v. Abrams* (1996) 44 Cal.App.4th 1599, 1604.)

The City Charter gives the boards of pension and retirement systems, including WPERP, "sole and exclusive responsibility" to administer the pension and retirement systems. (City Charter, § 1106(a).) The boards' actions are exempt from City Council review. (*Id*., §§ 245(d)(4), 1114.) Unlike other sub-units of the City, their participation in litigation is not under the control of the City Attorney, and the boards have the right to make decisions in litigation involving their policies and funds. (*Id*., § 272(c).) The City Charter also gives them the authority to settle litigation over those matters. (*Id*., § 273(a).)

Section 1106 of the City Charter, delineating the powers and duties of pension and retirement boards, states that it is "[c]onsistent with [a]rticle XVI, [s]ection 17 of the California Constitution." Article XVI, section 17, the "California Pension Protection Act of 1992," was enacted by the passage of Proposition 162. (*Westly v. Board of Administration*, *supra*, 105 Cal.App.4th at p. 1100.) It provides in part: "'Notwithstanding any other provisions of law or this Constitution to the contrary, the retirement board of a public pension or retirement system shall have plenary authority

13

and fiduciary responsibility for investment of moneys and administration of the system, subject to all of the following:

"'(a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries. . . .

"'(b) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty. [¶] . . . [¶]

"'(e) The retirement board of a public pension or retirement system, consistent with the exclusive fiduciary responsibilities vested in it, shall have the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system. [¶] . . . [¶]

"'(h) As used in this section, the term 'retirement board' shall mean the board of administration, board of trustees, board of directors, or other governing body or board of a public employees' pension or retirement system; provided, however, that the term 'retirement board' shall not be interpreted to mean or include . . . the elected legislative body of a jurisdiction which employs participants in a public employees' pension or retirement system.'" (*Id*. at p. 1101, fn. 6.)

The court in *City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69 addressed the effect of these provisions. The issue in *City of San Diego* was whether the San Diego City Employees' Retirement System (SDCERS) had the right to charge the City of San Diego for a shortfall in the funding of service credits purchased by city employees. (*Id*. at pp. 72-73.) The court observed "that public employee retirement system boards operate under a constitutional grant of plenary

14

authority which grants to them 'sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system.' (Cal. Const., art. XVI, § 17, subd. (a) . . . .)[9] [The voters intended t]his grant of exclusive authority over retirement system assets . . . to protect such boards from 'political meddling and intimidation' and to 'strictly limit the Legislature's power over such funds.' (Prop. 162, §§ 2, subd. (f), 3, subds. (e) & (g) (eff. Dec. 12, 1992).) Article XVI, section 17 was intended to 'insulate the administration of retirement systems from oversight and control by legislative and executive authorities.' [Citation.] Similarly, the City[ of San Diego]'s charter gives the [SDCERS] board 'exclusive control of the administration and investment of such fund or funds as may be established.' [Citation.]" (*Id.* at pp. 78-79.) The court observed, however, that "[u]nder article XVI, section 17(a), '[p]lenary power does not mean unreviewable power' and does not 'insulate pension boards from judicial oversight.' [Citations.]" (*Id.* at p. 79; accord, *Singh v. Board of Retirement*, *supra*, 41 Cal.App.4th at p. 1190, fn. 9.) The court concluded that the SDCERS board had exceeded its authority because "the enabling legislation passed by the City [of San Diego] for purchase of service credits specifically dictated that the total cost of such purchases would be borne by the employees. Charging the City [of San Diego] for SDCERS's underfunding exceeded SDCERS's authority as it was in violation of this legislation and exceeded its powers to administer retirement benefits." (*City of San Diego*, *supra*, at pp. 79-80.)

In *Singh v. Board of Retirement*, *supra*, 41 Cal.App.4th 1180, the court explained that article XVI, section 17 of the California Constitution was "intended by its proponents to insulate the administration of retirement systems from oversight and control by legislative and executive authorities, and also return control of the actuarial function to the retirement boards themselves. This 'increased level of independence would make the [retirement] systems less of a target for local and state officials looking for a way to balance a budget.' [Citation.] [¶] . . . Clearly, the word 'plenary' was intended to mean

---

**9** "'[P]lenary'" means "'[f]ull, entire, complete, absolute, perfect, unqualified.'" (*Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1190, fn. 9.)

that retirement boards would have the sole and complete power to invest their funds and to administer their systems, as opposed to being subject to direction from state and local legislative and executive bodies in these matters." (*Singh*, supra, at p. 1192.)

*City of San Diego* and *Singh* confirm that a retirement system such as WPERP has the power to operate independently of the City's control in certain situations. Bringing an action against the City in response to an attempt to encroach on the Board's authority, or defending an action by the City challenging the Board's authority, are two such situations. If retirement systems could not sue, they would have no way to "protect [themselves] from 'political meddling and intimidation'" by local legislative and executive authorities. (*City of San Diego v. San Diego City Employees' Retirement System*, supra, 186 Cal.App.4th at p. 79; *Singh v. Board of Retirement*, supra, 41 Cal.App.4th at p. 1192.) If they could not be sued, local legislative and executive authorities could not seek judicial review of a retirement system's actions if they believed those actions encroached on their authority, which is what occurred in *City of San Diego*. In that case the city brought an action against a retirement system for exceeding its authority and violating the city's exclusive power to set retirement benefits, and the retirement board defended itself and litigated in its own name. (*City of San Diego*, supra, at pp. 79-80.) We see no reason why a retirement board cannot do the opposite: If the City can sue a public retirement system to prevent encroachment on its exclusive authority, then a public retirement system can sue the city to protect itself from City interference in matters within the retirement system's plenary authority.

The fact that the City has a unitary form of government does not deprive WPERP of the capacity to sue the City under these circumstances. The City is a municipal corporation. (City Charter, § 100.) It has a City Attorney who "represent[s] the City in all legal proceedings against the City" and "initiate[s] appropriate legal proceedings on behalf of the City." (*Id*., § 271(a); see also § 272.) Although a municipal corporation may have many departments and subdepartments, for certain purposes "it is a single entity." (*Roccaforte v. City of San Diego* (1979) 89 Cal.App.3d 877, 888.) As a general rule, the various departments of a municipal corporation do not function independently of

16

the city of which they are a part. They do not have the power to employ independent counsel and charge the city for the cost of counsel. (See *Diamond International Corp. v. Boas* (1979) 92 Cal.App.3d 1015, 1028; *Glensor, Clewe & Van Dine v. Andriano* (1929) 99 Cal.App. 607, 608.)

As the City acknowledges, however, there are exceptions to these general principles. One exception arises where the municipal corporation's governing document gives a department the authority to act independently. For example, in *Civil Service Com. v. Superior Court* (1984) 163 Cal.App.3d 70, the issue was whether county counsel was disqualified from representing the county in litigation against a county department that county counsel previously had represented. The court characterized the department, the civil service commission, as "a 'quasi-independent' county agency." (*Id.* at p. 77.) Under the county charter, it had the authority to act "independent of the County's normal hierarchical structure." (*Ibid.*) Thus, when the county sued the commission, county counsel was disqualified from representing the county against its former "client," the commission. (*Id.* at p. 83.) The court emphasized that "the functions of government make it necessary for some public agencies within a governmental body to be accorded a considerable degree of independence vis-a-vis that body" (*id.* at pp. 73-74), and "that a conflict of this nature only arises in the case of and to the extent that a county agency is independent of the County such that litigation between them may ensue." (*Id.* at p. 83.) WPERP has this kind of independence.

Another exception, also applicable here, is a lawsuit by the municipality against its officers or bodies to resolve a controversy regarding the officer's or body's authority. (See, e.g., *City and County of S. F. v. Boyd* (1943) 22 Cal.2d 685, 693-694; *City of Redondo Beach v. Delong* (1981) 123 Cal.App.3d 1035, 1043.) Significantly, one example of this exception involved a lawsuit by a city against a city retirement system whose governing board took action of which the city disapproved. (*City of San Diego v.*

17

*San Diego City Employees' Retirement System*, *supra*, 186 Cal.App.4th at pp.72-73.)[10] The City does not explain why in these circumstances a municipal corporation with a unitary form of government can sue one of its sub-units but the sub-unit cannot sue the municipal corporation.

The City also asserts that "[t]he role of the City Attorney reflects the unitary nature of municipal corporations," because the City Attorney "singularly represents the at times competing sub-units of the unitary municipal corporation." Section 272 of the City Charter provides generally for control of litigation involving the City by the City Attorney. It also provides, however, in subdivision (c) that "[t]he boards of the Proprietary Departments," including WPERP, "shall make client decisions in litigation exclusively involving the policies and funds over which the Charter gives those boards control." (City Charter, § 272(c).) The City does not address the effect of subdivision (c). Nor does the City cite any authority in support of its contention that the Board's right to make client decisions only authorizes it "to sue *in the name of the municipal corporation*."

D. *WPERP Has Standing To Sue*.

Standing to sue requires that the party bringing the action have suffered "'"'an invasion of a legally protected interest . . . .'"'" (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 986; accord, *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 175; *Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1356.) To satisfy the requirements of standing, the plaintiff must allege and prove that the plaintiff or those whom the plaintiff represents have suffered or are about to suffer injury. (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1001.) Standing requires a plaintiff to show "'(1) injury in fact, (2) a causal connection between the injury and the conduct complained of and (3) a

---

[10] San Diego, like Los Angeles, is a charter city. (*City of San Diego v. San Diego City Employees' Retirement System*, *supra*, 186 Cal.App.4th at p. 74.)

likelihood that the injury will be redressed by a favorable decision. '" (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1098, italics omitted.)

The City argues that WPERP lacks standing to sue because WPERP and its members and beneficiaries have not suffered a cognizable injury. The City argues that real parties in interest have not alleged injury to WPERP or its members because, as a matter of law, an increase in unfunded accrued actuarial liability (UAAL) is not injury.[11]

The first amended complaint alleges that the recent "influx of City employees, to whom [WPERP] was required to provide benefits based on service credits they earned while in positions covered by LACERS, but without the benefit of any of the City's employer contributions paid to LACERS on behalf of those employees, has created in excess of $183 million in unfunded liabilities for the WPERP." The first amended complaint alleges that "[b]y virtue of the City's Council's 'veto' of the suspension of the Reciprocal Arrangement, WPERP and DWP have suffered and will continue to suffer real, present financial damage in the form of unfunded retirement obligations—present obligations to make future payments, a liability that DWP must amortize over 15 years." The first amended complaint further alleges that DWP's failure to meet these obligations

---

[11] The City does not argue in its petition that even if WPERP has standing to bring this action, the members of the Board do not. In its reply, the City argues for the first time that "City board members have no authority whatsoever to individually act in an official capacity" and that "board members and elected officials lack official capacity standing to sue their governmental entities." At the same time, the City states "[t]here is no difference" between the standing of the Board and its individual members, and that "since the [Board] and WPERP lack standing to sue the municipal corporation due to the City's unitary structure, the individual real parties in their official capacity automatically lack standing to sue the City as well." Because the City did not raise the issue of the individual members' standing until its reply, and because WPERP is a plaintiff in this action anyway, we decline to address this issue. (See *Simpson v. Kroger Corporation* (2013) 219 Cal.App.4th 1352, 1370 ["[r]aising a new theory in a reply brief is improper and unfair," and an appellate court "may decline to consider an argument raised for the first time in a reply brief if no good reason is demonstrated for the delay in raising the point"]; *Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 471, fn. 19 ["we need not address arguments raised for the first time in the reply brief and decline to do so here"].)

will "result in a reduction of employee benefits and/or default in the WPERP's obligations to its members and beneficiaries."

Public employees "have a contractual right to an actuarially sound retirement system." (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1137.) The Board has an obligation to """"maintain the integrity of the system."""" (*Ibid*.) WPERP alleges that the UAAL, which will continue to accrue as a result of the City Council's veto of the Board's suspension of reciprocity, jeopardizes WPERP's integrity and its ability to meet its obligations to its members and beneficiaries. These allegations, which we assume are true, sufficiently allege injury, and WPERP and the Board have standing to sue the City to maintain the integrity of WPERP on behalf of the members and beneficiaries they represent. (See, e.g., *id*. at p. 1118.)

*Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140, on which the City relies, does not support its position. In *Bandt* the court stated that "[a] decision that increases UAAL *is not necessarily* bad for members." (*Id*. at p. 157, italics added.) The court did not hold that an increase in UAAL can never harm system members, but found only that there was substantial evidence in the record in that case to support the trial court's finding that the increase in UAAL "'did not impair the ability of the fund to pay benefits to its members.'" (*Ibid.*) This case is still at the pleadings stage, and we assume that WPERP's allegations of injury and "real, present financial damage" are true. Moreover, the UAAL in *Bandt* had a very different origin than the UAAL alleged in this case. The UAAL in *Bandt* originated from the county's decision to increase pension benefits to the plan's members by $1.1 billion, which the court noted "[o]bviously . . . [did] not harm members," and to reduce the unfunded liability by voluntarily issuing bonds and contributing $550 million rather than amortizing the full amount of the $1.1 billion. (*Id*. at pp. 144, 157.)[12] The City's action in this case gave no benefit to WPERP;

_____

[12] The plaintiffs in *Bandt* sued the retirement board because, after receiving the $550 million, the retirement board, at the request of the county, approved an interim valuation of the pension fund to reflect the receipt of the $550 million, which had the effect of reducing the amount of the county's employer contribution the next fiscal year. (*Bandt v.*

20

it only gave WPERP a multi-million dollar UAAL detriment.  There is no suggestion that the City has any intention of making any contributions (by issuing bonds or otherwise) to the $183 million UAAL problem that WPERP alleges the City's action created.[13]

The City also argues that "[t]his case concerns an internal political dispute and not an actual or threatened invasion of the [Board's] 'plenary authority' to administer the WPERP."  Rather, the City asserts, the litigation involves an internal political dispute between WPERP and the City Council over "whether a particular retirement benefit— reciprocity of the WPERP with another City retirement system (the LACERS)—should continue. . . .  The resolution of this question would affect benefits [of] employees City-wide in the LACERS and the potential transfer of those employees to the LADWP."

We agree with the City's first assertion, well-established in the case law, that "[t]he granting of retirement benefits is a legislative action within the exclusive jurisdiction of the City." (*City of San Diego v. San Diego City Employees' Retirement System*, *supra*, 186 Cal.App.4th at p. 79; see *San Diego City Firefighters, Local 145 v. Board of Administration etc.*, *supra*, 206 Cal.App.4th at pp. 620-621.)  We disagree, however, with the City's second assertion that reciprocity in this case is the kind of retirement benefit with respect to which only the City, and not WPERP (or LACERS), can take action.

The City has not identified any legislation or regulation stating or suggesting that reciprocity is a benefit to which members of WPERP or LACERS are entitled under the plan.  Nor has the City submitted any document, such as a description of plan benefits or

_____

*Board of Retirement*, *supra*, 136 Cal.App.4th at p. 144.)  The plaintiffs claimed that the retirement board should have refused to recognize the $550 million in an interim valuation and refrained from recognizing it as long as possible, in order to maximize the county's employer contributions.  (*Id.* at p. 145.)  As real parties point out, the claim in *Bandt* "had an undeniable 'Alice in Wonderland' quality to it" because it required the retirement board to pretend the $550 million deposit did not exist.

[13]     *County of Orange v. Association of Orange County Deputy Sheriffs* (2011) 192 Cal.App.4th 21, 35 and *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 459-460 merely state that UAAL affects employer contributions to a pension plan.

a publication describing WPERP or LACERS, that identifies reciprocity as a benefit (and of which on demurrer we can take judicial notice). WPERP does not allege that the Reciprocity Arrangement is a plan benefit, but rather that it is an "arrangement to help provide portability of pension benefits between . . . WPERP and LACERS."

The only regulation we are aware of that addresses reciprocity between WPERP and LACERS, section 4.1060 of the Los Angeles Administrative Code, does not refer to reciprocity as a benefit. Subdivision (14) of section 4.1060, entitled "Reciprocity of Benefit Provisions . . . ," states: "It is the intent and purpose of this section to provide or help to provide portability between the LACERS and the WPERP. The achievement of complete portability of benefits is dependent upon appropriate action by the governing body of the WPERP. Should the implementation of any provisions of this section be possible only if some specific action is taken by the WPERP, then and as to such provisions only, the effect of this section shall be suspended until appropriate action has been taken by the WPERP." Far from demonstrating, as the City contends, that reciprocity is a benefit set by legislative action, this provision indicates that reciprocity is not a retirement benefit granted by the City, but rather it is an agreement between the City and WPERP authorizing portability of retirement benefits. Reciprocity was not established and implemented solely by the City Council as the City's legislative body, but rather it required approval by WPERP.

*Khan v. Los Angeles City Employees' Retirement System* (2010) 187 Cal.App.4th 98 was an action by a former city attorney who became a judge and who was a member of both LACERS and the Judges' Retirement System (JRS). The plaintiff sought "to compel LACERS to pay him retirement benefits based on his judicial salary earned while a member of JRS" based on reciprocity provisions in the statutes governing the Public Employees' Retirement System (PERS). (*Id.* at p. 103.) There was a reciprocity agreement between LACERS, on the one hand, and PERS and "all other agencies having reciprocity with PERS," on the other hand. (*Id.* at p. 104.) Although there was no reciprocity agreement between JRS and LACERS, the plaintiff argued that an amendment to Government Code section 20639 "extended reciprocity from JRS to LACERS."

22

(*Khan*, *supra*, at p. 104.)[14]  The City argued, somewhat inconsistently with its position in this litigation, that "any reciprocity under LACERS was extended only to those retirement systems which agreed, by contract entered into pursuant to statutory provisions governing PERS and the county retirements systems, to provide reciprocal benefits to LACERS members," and that there was no such agreement between LACERS and PERS. (*Id.* at p. 105.)

The court in *Kahn* agreed with the City and held that under the statutes governing PERS, "a pool of reciprocal agencies is established among . . . those public agencies having a reciprocal *agreement* with PERS."  (*Khan v. Los Angeles City Employees' Retirement System*, *supra*, 187 Cal.App.4th at pp. 109, 112.)  The court explained that "[t]rue reciprocity is mutual" and requires "a two-way agreement between retirement systems . . . ."  (*Id.* at p. 113.)  The court noted, "As described by PERS, '[r]eciprocity is an agreement among public retirement systems to allow members to move from one public employer to another public employer within a specific time limit without losing some valuable retirement and related benefit rights.'  [Citation.]"  (*Id*. at p. 108, fn. omitted.)  "[R]eciprocity encourages career public service by granting reciprocal retirement benefits to members who are entitled to retirement rights or benefits from two or more retirement systems, and delineates the financial obligations of each system and related political entities so that no system or political entity is liable for more than its just financial obligation.  [Citation.]"  (*Ibid*., fn. omitted.)  Thus, reciprocity is an *agreement* that allows public employees to move their retirement *benefits* from one retirement system to another when they change public employers.[15]

_____

**14**      Government Code section 20639 provides in relevant part, "The compensation earnable during any period of service as a member of the Judges' Retirement System [or] the Judges' Retirement System II, . . . shall be considered compensation earnable as a member of this system [PERS] for purposes of computing final compensation for the member, if he or she retires concurrently under both systems."

**15**      The City refers to a PERS publication quoted in *Kahn* that stated "LACERS is included as an agency that 'ha[s] contracted with [PERS] to provide the benefits of

23

The cases cited by the City do not support the City's position. *Maffei v. Sacramento County Employees' Retirement System* (2002) 103 Cal.App.4th 993 at page 998 and *Bonner v. County of San Diego* (2006) 139 Cal.App.4th 1336 at page 1353 used the terms "benefit" and "benefits of reciprocity" to mean the advantage or assistance of reciprocity. The issue in each of these cases was the application of reciprocity provisions in the County Employees Retirement Law of 1937 (CERL) to the calculation of retirement allowances or benefits for employees who had been members of two different retirement systems. The reciprocity provisions affected the calculation of employee benefits but were not retirement benefits. As other courts have explained, the purpose of the CERL reciprocity provisions is not to confer retirement benefits but "'to permit movement of employees from public employer to public employer without impairment of retirement rights,'" and "to 'protect[] the individual retirement system by avoiding the transfer of financial liabilities.'" (*Block v. Orange County Employees' Retirement System* (2008) 161 Cal.App.4th 1297, 1317; accord, *Lear v. Board of Retirement* (2000) 79 Cal.App.4th 427, 433.)

In *Piombo v. Board of Retirement* (1989) 214 Cal.App.3d 329, the court noted that "article 15 of the 1937 [CERL] Act, entitled 'Reciprocal Benefits,'" states that "'[t]he provisions of this article are intended to encourage career public service by granting reciprocal retirement benefits to members who are entitled to retirement rights or benefits

reciprocity." (*Khan v. Los Angeles City Employees' Retirement System*, *supra*, 187 Cal.App.4th at p. 110.) The context makes it clear, however, that the PERS document was using "benefit" in the broad sense of the term, meaning "anything contributing to an improvement in condition; advantage; help" (Webster's New World Dict. (3d college. ed. 1991) p. 129, col. 2; see, e.g., *People v. Segura* (2008) 44 Cal.4th 921, 929-930 [plea bargaining is a procedure by which "the defendant agrees to plead guilty [or no contest] in order to obtain a reciprocal benefit, generally consisting of a less severe punishment than that which could result if he were convicted of all offenses charged"]; *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 520 [zoning "involves reciprocal benefits and burdens"]; *Borders Online, LLC v. State Bd. of Equalization* (2005) 129 Cal.App.4th 1179, 1195 ["the reciprocal benefits of cross-referrals" between store and its website]), rather than in the narrow sense to refer to specific benefits available to an employee through a retirement system.

24

from two or more retirement systems . . . .'" (*Id*. at p. 336.) Reciprocity was not the benefit; "retirement rights or benefits from" a retirement system were the benefits. (See *Stillman v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2011) 198 Cal.App.4th 1355, 1363, fn. 4 [where certain "provisions of article 15 of CERL—Reciprocal Benefits—do provide additional benefits to employees entering into reciprocal employment," such as Government Code section 31833, which "provides that a qualifying employee shall be deemed to have entered the second retirement system at the age at which he or she entered the first retirement system," the benefit is the "lowering [of] his or her rate of contribution in the second system"].) "Reciprocal" was an adjective describing the noun "benefits."

The City also cites an Attorney General opinion that referred to "the benefits given by the reciprocity sections" and "the benefits of the reciprocity sections." (54 Ops.Cal.Atty.Gen. 221, 224 (1971).) The "benefit" to which the opinion referred is the ability to leave employee contributions on deposit in a retirement system after departing public service. (*Ibid*.) Again, reciprocity was not the benefit.

Thus, contrary to the City's assertion, WPERP is not attempting "to establish or terminate retirement benefits." WPERP is trying to preserve existing retirement benefits and make sure they will be available for its members. Reciprocity under the Reciprocal Arrangement is not a benefit that is within in the exclusive purview of the City that only the City, through legislative action, can give or take away.

E.     *The Board's Plenary Authority Over WPERP Assets Gives It the Power To Suspend Reciprocity.*

The City also contends the Board's "'plenary authority' over WPERP's assets cannot serve as a basis for suspending the reciprocity [agreement]." We think the Board's plenary authority extends to entering into, suspending, and even withdrawing from the Reciprocal Arrangement. The City, which is attempting to keep the Reciprocal Agreement in place, does not contend that the Board did not have the authority to enter into the agreement in the first place. If WPERP had the authority to enter into the

25

Reciprocal Arrangement, which WPERP alleges it had and which the City does not dispute, then WPERP should have the authority to suspend or withdraw from the Reciprocal Arrangement.[16] The allegation in the first amended complaint, which we accept as true on demurrer, is that both WPERP and LACERS "retained the separate right to unilaterally discontinue the Reciprocal Arrangement in their respective governing documents . . . ."

Moreover, including in the Board's plenary authority the ability to suspend the Reciprocal Arrangement is consistent with the purpose of article XVI, section 17 of the California Constitution. The findings and declarations of Proposition 162 state that "'"[p]oliticians have undermined the . . . security of all citizens who depend on pension benefits for their retirement by repeatedly raiding their pension funds,"'" that "'"politicians must be prevented from meddling in or looting pension funds,"'" and that "'"retirement board trustees must be free from political meddling and intimidation.'"" (*Westly v. Board of Administration*, *supra*, 105 Cal.App.4th at p. 1102, fn. 8.) The declaration of purpose provides that the intent of the People of the State of California was to "'"protect the taxpayers of this state against future tax increases which will be required if state and local politicians are permitted to divert public pension funds to other uses,"'" and to "'"give the sole and exclusive power over the management and investment of public pension funds to the retirement boards elected or appointed for that purpose, to strictly limit the Legislature's power over such funds, and to prohibit the Governor or any executive or legislative body of any political subdivision of this state from tampering with public pension funds."'" (*Id.* at p. 1102, fn. 7.)

WPERP alleges that these concerns were the basis for the Board's decision to suspend the Reciprocal Arrangement. WPERP alleges that the City's veto of the Board's suspension of the Reciprocal Arrangement is "the very kind of municipal invasion of retirement funds sought to be prevented by the City Charter and [a]rticle [XVI], [s]ection

---

[16] Of course, WPERP must still honor its obligations to those employees who already transferred from LACERS to WPERP before the suspension of reciprocity.

26

17 of the Constitution of the State of California," and "effectively accomplishes what the City cannot do under the City Charter and the California Constitution: transfer funding from WPERP to LACERS and thereby aid the City's efforts to balance its budget."[17] WPERP also alleges that the City's actions have "threatened the independence and plenary authority" of the Board, "interfered with Plaintiffs' authority and responsibilities as fiduciaries," and "jeopardized the financial stability of [WPERP] upon which the Plaintiffs and other beneficiaries depend for retirement benefits."

The City's reliance on *Westly v. Board of Administration*, *supra*, 105 Cal.App.4th 1095 is misplaced. *Westly* involved the question whether the PERS Board of Administration had the plenary authority "to set the salaries of its employees, to determine their civil service status, to determine the amount to reimburse its members and its members' employers, and to pay its employees without a warrant from or the review of the [State] Controller." (*Id.* at p. 1109.) The court reviewed the provisions of article XVI, section 17(a) of the California Constitution and concluded that, "with regard to administration of the system, the Board's authority is limited to actuarial services and to the protection and delivery of the assets, benefits, and services for which the Board has a fiduciary responsibility. No such power is given over the administration of the matters at issue here." (*Westly*, *supra*, at p. 1110.) The court also determined that "the voter intent [in enacting Proposition 162], evidenced by the published ballot materials, is that [a]rticle XVI, section 17 would give the Board the authority to administer the investments, payments, and other services of CalPERS, but not the compensation of the Board or the Board's employees." (*Id.* at p. 1112.) Nothing in *Westly* suggests that the Board's plenary authority to administer WPERP does not include the power to suspend

---

**17** The DWP funds WPERP through employer contributions, and WPERP's obligation to pay benefits is a general obligation of the DWP. (City Charter, § 1188(b) & (c).) The obligation to pay benefits of LACERS is a general obligation of the City. (*Id.*, § 1160(b).) Real parties claim that this makes WPERP's assets a potential target to assist the City with its budgetary issues.

27

the Reciprocal Arrangement in order to "protect[] and deliver[] . . . the assets, benefits, and services for which the Board has a fiduciary responsibility." (*Id.* at p. 1110.)

The City also argues that the Board cannot have plenary authority to amend WPERP because section 1186 of the City Charter requires Commission approval of the amendment, and that allowing the Board "unilaterally to suspend reciprocity would deprive the . . . Commission of its Charter authority under section 1186 to approve benefit changes." Article XVI, section 17 of the California Constitution, however, gives "the retirement board of a public pension or retirement system . . . plenary authority and fiduciary responsibility for investment of moneys and administration of the system." The City cannot by charter limit that authority if doing so would conflict with the California Constitution. (See Cal. Const., art. XI, § 5;[18] *Johnson v. Bradley* (1992) 4 Cal.4th 389, 395 & fn. 6; *Miller v. City of Sacramento* (1977) 66 Cal.App.3d 863, 867-868.) In addition, subdivision (h) of article XVI, section 17 provides that the term "'retirement board'" can mean many things, including "the board of administration, board of trustees, board of directors, or other governing body or board of a public employees' pension or retirement system," but the one thing "that the term 'retirement board' shall not be interpreted to mean or include [is] the elected legislative body of a jurisdiction which employs participants in a public employees' pension or retirement system." Thus, article XVI, section 17 allows a governing body of a municipal department, such as the Commission, to approve or disapprove the Board's actions, but it does not allow the City Council, "the elected legislative body," to approve or disapprove the Board's action.

---

**18**  Section 5(a) of article XI of the California Constitution provides that city charters are "subject to general laws." Section 5(b) provides that charters may contain specified provisions "in addition to those provisions allowable by this Constitution . . . ."

28

## DISPOSITION

The petition for writ of mandate is denied.  Real parties are to recover their costs.


SEGAL, J.[*]


We concur:


PERLUSS, P. J.


WOODS, J.

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.